

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00029-CV

_____

IN THE INTEREST OF K.M., B.H., D.H., AND J.H.H., CHILDREN

On Appeal from the County Court at Law
Panola County, Texas
Trial Court No. 2016-355

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

For more than two decades, Stanley and Ellen's relationship had been riddled with illicit drug use, which resulted in various problems, including multiple criminal convictions for Stanley and one for Ellen. According to the trial court, the couple's drug use and associated actions also endangered, and created behavioral problems with some of, their boys—Brad, Derrick, and Jason being the natural children of both Stanley and Ellen, but Kevin being only Ellen's natural son.[1]

In the some fifteen months that elapsed between the removal of the boys from the home by the Texas Department of Family and Protective Services (the Department) and the trial at which their parental rights were terminated, Stanley and Ellen had been drug-free and sober and had faithfully performed most elements of their service plans prescribed for them by the Department. But, because of their previous and repeated drug use and other factors, the trial court determined that termination was authorized on various predicate grounds and was in the boys' best interests.

In this accelerated appeal, Stanley and Ellen assert that the evidence was legally and factually insufficient to terminate their parental rights to their respective children pursuant to grounds (D), (E), and (L). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (L) (West Supp. 2017). Stanley and Ellen also argue that the evidence was legally and factually insufficient to support the trial court's finding that termination of their parental rights was in the children's best interests. *See* Tex. Fam. Code. Ann. § 161.001(b)(2) (West Supp. 2017).

---

[1]In this opinion, we refer to the boy's mother as Ellen and to Brad, Derrick, and Jason's father as Stanley. Stanley is not Kevin's biological father. We refer to all these by pseudonyms in order to protect the children's identities. *See* Tex. R. App. P. 9.8.

We affirm the trial court's order because (1) sufficient evidence supports at least one predicate ground for termination of both Stanley's and Ellen's parental rights and (2) sufficient evidence supports the best-interest findings.

*(1)     Sufficient Evidence Supports at Least One Predicate Ground for Termination of Both Stanley's and Ellen's Parental Rights*

"The natural right existing between parents and their children is of constitutional dimensions." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Indeed, parents have a fundamental right to make decisions concerning "the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). This Court is therefore required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *Id*. at 500. "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20).

To terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2017); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012). Clear and convincing evidence is that "degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *see In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). This standard of proof necessarily affects our review of the evidence.

In our legal-sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder could reasonably have formed a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.). We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding if a reasonable fact-finder could do so, and disregarded contrary evidence and witnesses that the fact-finder could have reasonably disbelieved or whose credibility could reasonably be doubted. *J.P.B.*, 180 S.W.3d at 573.

In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that disputed evidence in favor of its finding. *Id*. at 28. If, in weighing the disputed evidence, the fact-finder could have reasonably resolved the conflicts to form a firm conviction that allegations concerning the grounds for termination were true, then the evidence is factually sufficient, and the termination findings must be upheld. *Id*. at 18–19. In applying this standard in light of the "clear and convincing" threshold required by Section 161.001 of the Texas Family Code, we must be careful not to "be so rigorous that the only fact-findings that could withstand review are those established beyond a reasonable doubt." *In re R.A.L.*, 291 S.W.3d 438, 443 (Tex. App.—Texarkana 2009, no pet.) (quoting *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006)).

Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, "the rights of natural parents are not absolute; protection of the child is paramount." *In re*

*A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26).

Stanley and Ellen assert that the evidence is legally and factually insufficient to support termination pursuant to grounds (D), (E), and (L). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (L). "Only one predicate finding under Section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.) (citing *A.V.*, 113 S.W.3d at 362); *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.). "If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights." *K.W.*, 335 S.W.3d at 769 (quoting *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.)).

The trial court found that Stanley and Ellen engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Under ground (E), the term endanger "means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment, but that endangering conduct need not be directed at the child." *E.N.C.*, 384 S.W.3d at 803. To endanger "means to expose to loss or injury." *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Ground E "refers only to the parent's conduct, as evidenced not

5

only by the parent's acts, but also by the parent's omissions or failures to act." *Id.* at 366–67 (quoting *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied)). Moreover, termination under ground E requires more than a single act or omission. Instead, a "voluntary, deliberate, and conscious course of conduct by the parent" must be established. *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.).

The Department's removal of the children was prompted by a November 2016 report of neglectful supervision and physical neglect of the children. At that time, Kevin was fourteen years, Brad was twelve years, Derrick was ten years, and Jason was nine months old. A Department investigator visited the trailer home where the family resided and found all children present, clean, and healthy. The home, however, was dirty—with diapers, trash, and debris scattered throughout the house—and infested with roaches.

Ellen admitted to the investigator that she used methamphetamine and cocaine and that she last used drugs the preceding day. At trial, Ellen testified that she started using methamphetamine when she was eighteen and in college. After having given up drugs after college, Ellen started using drugs again when she was twenty-six. When Kevin was a toddler and Brad was a baby, she and Stanley would have friends over to smoke methamphetamine while the children were in the home. She quit using methamphetamine around 2005, but used K2[2] a few times after that. After Jason was born, Ellen started using methamphetamine again. Ellen was forty-one years old at the time of trial.

---

[2]K2 is one of a number of synthetic cannabinoids, human-made mind-altering chemicals made to mimic an illegal drug. *See, e.g.*, NATIONAL INSTITUTE ON DRUG ABUSE, WHAT ARE SYNTHETIC CANNABINOIDS? (2018), https://www.drugabuse.gov/publications/drugfacts/synthetic-cannabinoids-k2spice.

As a teenager and in his late twenties, Stanley used marihuana and drank a lot. He later used methamphetamine in 2005 and K2 in 2007 and was using methamphetamine and marihuana in 2016. Stanley and Ellen had been using methamphetamine on a daily basis for a couple of months at the time of the Department's intervention.[3] The children were removed from the home and placed with their maternal aunt. Drug test results for Ellen were positive for methamphetamine and cocaine. Drug test results for Stanley were positive for methamphetamine and marihuana. The baby—Jason—tested positive for methamphetamine.

After the children were placed with their maternal aunt, the three oldest children were interviewed at the Children's Advocacy Center, where Kevin reported that Stanley hit him on multiple occasions. The children also reported sexually acting out among themselves. Thereafter, Kevin was moved to Pegasus, a program designed to address sexualized behaviors in children.[4] Brad and Derrick were placed in a foster home, and Jason was placed in a separate foster home. Derrick reported having a sexual interaction with another child in the foster home and was thereafter moved to Pegasus. Consequently, Kevin was moved to Brookhaven Youth Ranch for sex-offender maintenance therapy. Meanwhile, Stanley and Ellen were working on their Family Service Plans.

The Family Service Plan required Ellen to remain drug free, complete a drug assessment, and attend outpatient treatment concerning her drug use issues. Ellen completed the drug

---

[3]At the time of trial, Ellen and Stanley had been clean and sober for over one year. Their drug addiction counseling was focused on relapse prevention.

[4]Throughout the course of his stay at Pegasus, Kevin reported that he liked being there better than he liked being at home.

assessment and the drug addiction counseling and has remained drug free through the pendency of the case. She completed Overcomer's, a drug counseling course, in July 2017. Ellen was also required to complete a psychological assessment and to attend parenting classes. She successfully completed both. The Family Service Plan also required Ellen to obtain and maintain a safe and stable home, free of any type of infestation. The condition of her home, however, failed to comply with the requirements of the Family Service Plan. On a subsequent visit to the home, however, its condition was better and cleaner, although it still smelled of animal urine and cigarette smoke.

Ellen timely attended visitation sessions with the children, beginning in January 2017. Those visits were suspended for both parents at the end of January 2017, due to concerns about an outcry by Kevin of physical and sexual abuse by Stanley. Although Kevin recanted the outcry of sexual abuse, he did not recant the outcry of physical abuse.[5] Both Kevin and Derrick reported that Stanley hit Kevin, had broken a broom handle over Derrick's back, and frequently screamed and cussed at them. Kevin reported that Ellen had slapped him in the face.

Ellen had one visit with Derrick, Brad, and Jason in late 2017, after she agreed that Stanley would move from the family home. She was not permitted additional visits after that time.[6]

---

[5]After Kevin's allegation of sexual abuse by Stanley was recanted and it was determined that Stanley was not going to be prosecuted, the Department did not resume visitation with the children due to concerns of physical abuse. The children indicated that they were afraid of Stanley and did not want to see him.

[6]The Department originally worked toward family reunification, but apparently abandoned that goal when the Department believed that the couple continued living together after the Department suggested that Stanley move out. In an attempt to achieve reunification with her children, Ellen agreed that Stanley should move out of the family home. Pastor E.J. Adams of the First Assembly of God Church in Timpson testified that Stanley moved his trailer onto church property with his permission. Stanley lived on church property for three or four months until Adams asked him to move in the Fall 2017 when it was determined that the trailer presented a city ordinance violation. Although Stanley had moved for a short duration, the Department discovered that he was again living in the family home when they made an unannounced home visit in November 2017.

Stanley has had no contact with the children since January 2017. The Department believed that Ellen and Stanley should live separate and apart based on the children's statements that they were frightened of Stanley and Ellen's continued denials of domestic violence. According to the Department, Ellen's general attitude about protecting her children never improved.

Stanley, likewise, completed the requirements of his service plan—including completing parenting classes, psychological counseling, anger management, and the submission to drug testing. Both parents continued to participate in substance abuse counseling. Stanley tested negative on every drug test administered pursuant to the service plan and denied having been physically abusive to the children. He, like Ellen, completed an Overcomer's drug counseling program in July 2017. Stanley's visits with the children were appropriate, and the Department was not aware of any school records that would indicate that any of the children were physically abused in the home.

Stanley is, however, a registered sex offender. This status resulted from an incident in 2006 in which Stanley and Ellen gave their sixteen-year-old babysitter methamphetamine and alcohol so that Stanley could have sex with her.[7] As a result of this occurrence, Stanley pled guilty to sexual assault, for which he received deferred adjudication and six years' community supervision. Stanley was also convicted of driving while intoxicated in 2001 and 2005 and for

---

On that visit, the home smelled of animal urine, feces, and cigarettes. There was dog feces on the floor, there were ashtrays filled with cigarette butts all over the living room, and there were dirty dishes and open food containers in the kitchen.

[7]As a result of this incident, Kevin and Brad were removed from the home, but were later returned.

driving with a suspended license in 2000, 2002, and 2006.[8]  He was convicted of possession of a controlled substance in 2013, solicitation in 2013,[9] and failure to register as a sex offender in 2016. For that offense, Stanley was sentenced to six years' incarceration, suspended in favor of six years' community supervision.  In 2017, both parents were convicted of endangering a child as a result of nine-month-old Jason's positive test for methamphetamine.  Each parent was sentenced to two years' incarceration, suspended in favor of five years' community supervision.

Kevin was exposed to sexually explicit material at a young age in the form of pornographic magazines.  By the time he was thirteen, Kevin had watched pornographic movies on the internet and had seen Stanley do the same thing.  And, during the course of the Department's investigation, it was discovered that the three older children were involved in sexual activities among themselves while they were living with their parents.

According to Kevin, Stanley has a bad temper, would sometimes hit Kevin, and once kicked him in the stomach.  He testified that Stanley once hit Ellen with a surge protector and hit Derrick across the back with a broom.  When Jason was seven or eight months old, Stanley threw him down on a swivel chair.  On one occasion, Kevin accompanied Ellen to purchase some K2.

When he was thirteen, Kevin took care of the other children during the summer, because Stanley and Ellen spent so much time in their room.  That is when things began to change for the worse.  Kevin cooked the meals and fed the baby.  In spite of the worsening conditions of his home life, Kevin was able to attend band and football camp that summer.  When school started, however,

_____

[8]Stanley testified that, at the time of trial, he did not have a valid driver's license and was driving to and from his job at Whataburger without a valid license.

[9]Stanley disputes that he was convicted of a solicitation offense.

10

Kevin took care of his brothers when he got home. Ellen was working nights at Walmart at that time. Kevin described the family home as "dirty."

Despite the fact that Stanley and Ellen made significant progress on their addiction issues, completed the requirements of their Family Service Plans, and had been attending church at the First Assembly of God for approximately eighteen months,[10] the trial court nevertheless chose to terminate their parental rights. We cannot conclude that the evidence was legally and factually insufficient to do so. More specifically, we conclude that the trial court was presented with clear and convincing evidence of ground (E) endangerment by both parents.

"Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct." *In re N.S.G.*, 235 S.W.3d 358, 368 (Tex. App.—Texarkana 2007, no pet.)); *see J.O.A.*, 283 S.W.3d at 345 n.4; *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.) ("Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child."). "Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001[(b)](1)(E)." *Walker v. Tex. Dep't Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Vasquez v. Tex. Dep't Protective & Regulatory Servs.*, 190 S.W.3d 189, 195–96 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)

---

[10]They have a positive relationship with church members. Stanley runs the church's sound system and built a swing set for the church. Ellen participates in the church's visitation program.

("terminating parental rights despite there being no direct evidence of parent's continued drug use actually injuring child")).

Both parents were relatively young when they began engaging in illicit drug use. That drug use apparently became a regular habit, as evidenced by the fact that Stanley and Ellen had friends over to their house to smoke methamphetamine. Those visits happened when Kevin and Derrick were present in the home. The couple's illicit drug use continued over the years, and, when nine-month-old Jason was removed from the home, he had methamphetamine in his system. As a result, both Stanley and Ellen were convicted of child endangerment and are currently on community supervision for that crime. And, due at least in part to their illicit drug use or addiction, Ellen and Stanley supplied their sixteen-year-old babysitter with methamphetamine and alcohol so that Stanley could engage in sex with her. As a result, Stanley was convicted of sexual assault and was subsequently convicted of failure to register as a sex offender. As a further result of continued, illicit drug use by both parents, Kevin shouldered responsibilities for his siblings that rightfully belonged to his parents. The evidence further establishes that Stanley had anger issues and had been physically abusive to at least three of the children. Although this evidence alone would be sufficient to support termination under ground (E), the trial court had before it additional evidence of endangering conduct.

The oldest child, Kevin, was exposed to pornography in the home for a period of several years. The three older boys have acted out sexually with one another while under Stanley and Ellen's supervision. This sexualized behavior was evidently so pervasive that both Kevin and Derrick were placed in specialized facilities to manage the treatment of this type of behavior in

12

children.  "A parent's refusal to acknowledge responsibility for [their children] and protect them from a situation that exposes the child to the risk of sexual abuse is grounds for termination of parental rights under subsection (E)."  *In re D.D.D.K.*, No. 07-09-0101-CV, 2009 WL 4348760, at *9 (Tex. App.—Amarillo Dec. 1, 2009, no pet.) (mem. op.).

The foregoing evidence was sufficiently clear and convincing to support termination of both Stanley's and Ellen's parental rights under ground (E).

*(2)      Sufficient Evidence Supports the Best-Interest Findings*

To uphold the termination findings, we must determine whether the Department proved, by clear and convincing evidence, that termination of Stanley's and Ellen's parental rights was in the children's best interests.  *See* TEX. FAM. CODE ANN. § 161.001.  There is a strong presumption that a child's interest is best served by preserving conservatorship in the natural parent.  That presumption can be overcome, however, with clear and convincing evidence to the contrary.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).

A number of factors may be considered in determining the best interest of the child, including

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)).  This list is not exclusive, and there is no requirement that

any unique set of factors be proved. *Id.* Certainly, it is not necessary to prove all nine factors. *C.H.*, 89 S.W.3d at 27. The analysis of evidence relating to one factor may be adequate in a particular situation to support a finding that termination is in the best interest of the child. *Spurck v. Tex. Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.). Additionally, evidence supporting the termination of parental rights is also probative of best interest. *C.H.*, 89 S.W.3d at 28.

Jason, who was not quite two years old at the time of trial, had been living in his foster home for eight months, where he was happy and thriving. Jason's foster parents have expressed the desire to adopt him. Due to his young age, Jason's desire cannot be determined. However, "[w]hen children are too young to express their desires, the fact-finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The Court Appointed Special Advocate (CASA) testified that she believed it was in Jason's best interest for parental rights to be terminated and for the adoption to take place.

Kevin, who was sixteen years old at the time of trial, testified that he was living at Brookhaven Youth Ranch and that he liked it there. Kevin testified that he did not want to live with Stanley and Ellen and that he was afraid for his brothers to return home. The CASA representative also testified that Kevin expressed the desire not to return home.[11]

---

[11]While Kevin was testifying, Stanley—who was present in the courtroom—was giggling and rolling his eyes.

Brad, who was residing in a foster home at the time of trial, felt safe in his foster home and expressed the desire to remain there rather than to return home. He was reportedly happy in his foster home, and all of his needs were being met. Derrick was residing at Pegasus at the time of trial, and that facility was meeting his needs.[12] The CASA representative testified that she believed that termination was in each of the children's best interests.

Ellen and Stanley both testified that they believed that it was in Kevin's best interest to remain at Brookhaven until he completed therapy. Ellen testified that Derrick should remain at Pegasus until he gets better. The emotional and physical needs of these two children are great, as they require structure and specialized counseling for the issues encountered while living with Stanley and Ellen.

Ellen, who was unemployed and without a driver's license at the time of trial, testified that the trailer home in which she and Stanley then resided was not large enough to accommodate the children and that they would require a larger space before the children could return home. Stanley, who was employed at a fast-food restaurant and without a driver's license at the time of trial, testified that the single-wide, three-bedroom mobile home was large enough for the children and that they would enjoy a loving and attentive environment there.[13]

---

[12]The April 2017 CASA report indicated that Derrick and Brad wished to return home because they missed their parents, friends, and school. Both Derrick and Brad persisted in their wish to return home through August 2017. However, none of the children expressed a desire to return home within the eight to ten months before trial.

[13]Stanley testified that, for a period of approximately five months, he and Ellen did not provide such an environment for the children. According to Stanley, the lack of a stable home environment was due to methamphetamine use.

Yet, several factors weigh against Stanley's and Ellen's desire to maintain their parental relationship with the children. Foremost among those factors are the children's present and future physical and emotional needs, Stanley and Ellen's ability to provide a safe and stable home for the children, and their acts and omissions suggesting that the existing relationship with the children is not a proper one. Although Stanley and Ellen passed all of their drug tests, the totality of their past decisions, including a disturbing pattern of continuing drug use, the failure to maintain a safe, sanitary, and stable home environment, several criminal convictions—not the least of which was for child endangerment—and supervising children who are sexually acting out with one another, all mitigate against their ability to maintain their parental relationship with the children.

The evidence shows that, at the time the children were removed from the home, it was unsanitary and roach infested. Even though Stanley and Ellen were given the opportunity to improve those unsanitary conditions, the record indicates that the home remained unsanitary many months after the children were removed. Stanley and Ellen have exhibited a disturbing pattern of methamphetamine use, perhaps quitting for a time, and then falling back into methamphetamine use. They have repeatedly exposed their children to methamphetamine, first when Kevin was a toddler and Brad was a baby and next—insofar as the record reflects—for several months before removal in this case, resulting in high levels of methamphetamine reflected on Jason's hair-strand test.[14]

---

[14]Jason's level of exposure to methamphetamine was 1,793 picograms per milligram. Ellen and Stanley were heavy methamphetamine users. Ellen's methamphetamine level was tested at 13,350 picograms per milligram, well above 7,500 picograms per milligram—the range considered to be "constant use." Stanley's methamphetamine level was tested at 7,657 picograms per milligram, well within the "constant use" range.

On the other hand, the children are currently living in loving and safe environments where they receive the care and stability they need, free from drugs, violence, neglect, and exposure to pornography. Based on this record, under the standards as set out above, we conclude that the evidence is sufficient to allow the trial court to determine that the children's best interests were served by the termination of Stanley's and Ellen's parental rights. Therefore, Section 161.001(b)(2) of the Texas Family Code has been met. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice


Date Submitted:      July 17, 2018
Date Decided:        August 9, 2018